IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| Plaintiff, | Civil Action No. 23-cv-459 |
| v. | **Electronically filed** |
| **JOSHUA W. COLEMAN,** | **JURY TRIAL DEMANDED** |
| Defendant. | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint against defendant Joshua W. Coleman ("Coleman" or "Defendant") and alleges as follows:

### SUMMARY OF THE ACTION

1. From December 2018 through at least June 2022, Coleman orchestrated a fraudulent scheme through his then-registered investment adviser, Vesta Advisors, LLC ("Vesta Advisors"), and other companies under his control, to obtain over $200 million in illicit loan proceeds from a series of lenders by, among other things, misrepresenting his authority over, and the value of, securities pledged as collateral for the loans.

2. Coleman perpetrated the initial phase of his scheme by cumulatively pledging over $160 million in advisory client assets as collateral for personal loans without his clients' knowledge or authorization, and deceived his lenders by forging client signatures and fabricating account statements and other documents.

3. Coleman used the illicit proceeds to fund private investments, repay earlier loans, and pay personal business expenses. Coleman ultimately defaulted on one loan, which resulted in his lender seizing $20 million in pledged client assets.

4. To repay his advisory clients and other creditors, Coleman targeted two private lenders for additional financing.  Coleman pledged various securities as collateral for these loans, including stock and equity interests in his companies.

5. Coleman lied to the two private lenders concerning the existence of prior encumbrances on certain pledged collateral, misrepresented the intended use of the loan proceeds, and fabricated bank statements, UCC-3 termination statements, and other documents in furtherance of his scheme.  Coleman ultimately defaulted on these loans, resulting in losses to the lenders of over $50 million in connection with his securities fraud-related misconduct.

6. By engaging in the conduct described in this Complaint, Coleman violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 promulgated thereunder [17 C.F.R § 240.10b-5], and Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2) and (4)], and Rule 206(4)-8 promulgated thereunder [17 C.F.R. §§ 275.204-8].

7. The Commission seeks (i) to enjoin Coleman from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, (ii) disgorgement of ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest, (iii) the payment of a civil penalty, (iv) an order permanently prohibiting Coleman from serving as an officer or director of any public company that has a class of securities registered under Section 12 of the Exchange Act or is required to file reports under Section 15(d) of the Exchange Act, and (v) such other relief as the Court may deem appropriate.

**JURISDICTION AND VENUE**

8. The Commission brings this action pursuant to Sections 20(b), 20(d), and 20(e) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77t(e)], Sections 21(d) and 21(e) of the Exchange Act, [15 U.S.C. §§ 78u(d) and 78u(e)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9] to enjoin such acts, transactions, practices, and courses of business, to obtain disgorgement, prejudgment interest, civil money penalties, and an order permanently prohibiting Coleman from serving as an officer or director of certain public companies, and such other and further relief as the Court may deem just and appropriate.

9. This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v], Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa], and Sections 209 and 214 of the Advisers Act [15 U.S.C. §§ 80b-9 and 80b-14].

10. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. Certain of the acts, transactions, events, and omissions giving rise to the violations of the federal securities laws alleged in this Complaint occurred within this District. Coleman also resides in this District and, for much of the timeframe relevant to this Complaint, Vesta Advisors' principal place of business was located in this District.

**DEFENDANT**

11. **Joshua W. Coleman**, age 37, resides in North Wales, Pennsylvania. Coleman formed Vesta Advisors in April 2018. Between July 2018 and May 2020, Coleman was associated with Vesta Advisors as an investment adviser representative, served as the firm's

Chief Compliance Officer, and had responsibility over Vesta Advisors' compliance program and its implementation.

## RELEVANT ENTITIES

12.     **Vesta Advisors, LLC** is a Wyoming limited liability company, with its principal place of business in Lower Gwynedd, Pennsylvania. Vesta Advisors was registered with the Commission from July 27, 2018 until May 21, 2020, when it voluntarily withdrew its registration.

13.     **Vesta Ottawa Feeder LP** ("Vesta Feeder Fund") is a Delaware limited partnership with a principal place of business in Lower Gwynedd, Pennsylvania.  The Vesta Feeder Fund was located at the same premises as Vesta Advisors and was managed by a general partner owned by a corporate entity under Coleman's control.

14.     The Vesta Feeder Fund was formed in January 2020 as a pooled investment vehicle and claimed exemption from registration with the Commission as an investment company pursuant to Section 3(c)(1) of the Investment Company Act of 1940.

15.     Vesta Advisors served as the investment manager to the Vesta Feeder Fund, into which some of Vesta Advisors' clients contributed funds.

## FACTS

**I.     Background**

16.     Beginning in at least 2011, Coleman offered a suite of services to high-net-worth individuals, including insurance products, tax planning, and assistance with family office operations, through a network of companies he controlled.

17.     In April 2018, Coleman formed Vesta Advisors to provide investment advisory services to certain insurance and family office clients.  Coleman also used Vesta Advisors to purchase and manage some of his personal investments.

4

18.     Vesta Advisors was registered with the Commission as an investment adviser, held itself out as an investment adviser, entered into formal investment advisory relationships with clients, and advised clients regarding the purchase and sale of securities in exchange for compensation.

19.     Coleman was associated with Vesta Advisors during its period of registration and exercised ultimate control over the firm, including investment decisions made on behalf of clients, and operated on behalf of Vesta Advisors in the scope of his employment.

20.     Defendant received compensation through Vesta Advisors in the form of advisory fees and the reimbursement of investment adviser representative expenses, and, as set forth below, through the conversion of client assets for his own benefit.

## II.     Coleman Cumulatively Pledges Over $160 Million in Advisory Client Assets as Collateral for Personal Loans Without his Clients' Knowledge or Authorization

### A.     Coleman Obtains a Bridge Loan to Fund a Personal Investment by Falsely Claiming that an Advisory Client Had Agreed to Repay the Debt

21.     In October 2018, Coleman, through a company under his control, agreed to purchase the entire limited partnership interest in an oil and gas venture (the "Energy Venture") for approximately $22 million. As part of the purchase agreement, Coleman paid a $4 million nonrefundable deposit and agreed to close the transaction by December 28, 2018.

22.     Coleman sought a $10 million equity co-investment for the Energy Venture from one of his advisory clients ("Client 1"). On or about December 11, 2018, however, Client 1 informed Coleman that he would not co-invest in the Energy Venture.

23.     Absent Client 1's co-investment, Coleman lacked the funds necessary to close on the Energy Venture and risked losing his $4 million nonrefundable deposit. To fund the balance due, Coleman sought a two-month, unsecured $20 million bridge loan from a New York-based bank ("Bank A") on behalf of Vesta Advisors.

24. In support of his bridge loan application, Coleman misrepresented to Bank A that Client 1 would repay the loan on behalf of Vesta Advisors in exchange for an interest in the Energy Venture. Client 1, as Coleman knew, had declined to invest in the Energy Venture and did not authorize or agree to repay the $20 million loan.

25. Based on Coleman's false representation regarding Client 1's commitment to serve as a source of repayment, Bank A funded the bridge loan and Coleman used the proceeds to pay the balance due on the Energy Venture.

  **B.**  **Coleman Improperly Pledges Client Securities as Collateral for a $25 Million Line of Credit**

26. In February and March 2019, Bank A questioned Coleman concerning Client 1's failure to repay the bridge loan as planned.

27. Coleman again misrepresented to Bank A that Client 1 intended to repay the loan, and falsely claimed that Client 1 had agreed to post collateral for a new line of credit to replace the original, unsecured bridge loan. Client 1 had no knowledge of, and had not agreed to pledge his assets for, any line of credit.

28. On March 25, 2019, Client 1 transferred operating units he owned in a publicly traded real estate investment trust ("REIT") (the "Operating Units") to a Vesta Advisors' brokerage account maintained at an affiliate of Bank A only for the purpose of facilitating their liquidation by Vesta Advisors. Client 1's Operating Units constitute securities within the meaning of the Securities Act and the Exchange Act.

29. Coleman arranged for Bank A to issue a new, $25 million line of credit to Vesta Advisors, secured by approximately $40 million of Client 1's Operating Units, without authorization from Client A.

30. Bank A funded the $25 million line of credit immediately upon the receipt of Client 1's Operating Units.

31. Coleman then withdrew the full proceeds from the facility to repay the $20 million unsecured bridge loan, pay business expenses incurred by a separate entity owned by Coleman, and facilitate an unrelated private investment.

    **C. Coleman Improperly Pledges Client Securities as Collateral for a $100 Million Line of Credit**

32. In April 2019, Client 1 directed Bank A to transfer the proceeds from the sale of his Operating Units from the Vesta Advisors account to a separate Bank A-affiliated account under Client 1's direct control. Bank A, however, could not transfer the full proceeds because Client 1's funds were collateralizing the $25 million line of credit.

33. To conceal his improper conduct and avoid detection, Coleman falsely claimed that the proceeds could not be transferred because he had invested them in illiquid securities and needed time to unwind the positions.

34. Coleman then applied for a new, $100 million line of credit with Bank A to replace the $25 million facility, which would release the encumbrance on Client 1's funds. Coleman arranged for the new line of credit to be issued to Vesta Capital, LLC ("Vesta Capital"), a company under Coleman's control.

35. To secure the new line of credit, Coleman pledged $100 million in bonds and other assets invested through Vesta Advisors by a married couple ("Client 2"), who recently became advisory clients of the firm. Client 2's bonds constitute securities within the meaning of the Securities Act and the Exchange Act.

36. Coleman did not disclose to Client 2 that he had pledged their assets as collateral for a $100 million line of credit. The $100 million line of credit was originated in late April

2019, secured with Client 2's assets on May 24, 2019, and thereafter immediately funded by Bank A.

37.     On May 24, 2019, Coleman used proceeds from the $100 million line of credit to repay the balance on the $25 million line of credit, thereby releasing Client 1's collateral. Coleman also drew approximately $2.75 million from the line of credit to pay expenses incurred in connection with his personal investments.

38.     Within days of issuing the $100 million line of credit, Bank A questioned Coleman's authority to pledge Client 1's and Client 2's assets and requested proof that Coleman's clients had approved these arrangements.

39.     In response, Coleman falsely assured Bank A that his clients had knowingly conferred on him the authority to pledge their assets.  Coleman supported this deception by, among other things, providing Bank A with altered client emails that made it appear that he was operating with client approval.

40.     Bank A nevertheless unilaterally refinanced the $100 million Vesta Capital line of credit into a new term loan, thereby releasing Client 2's collateral and making Coleman responsible for repaying the funds he had drawn from the line of credit collateralized by Client 2's assets.

41.     On June 6, 2019, Coleman emailed Client 2, disclosing for the first time his use of their assets as collateral for a line of credit issued to Vesta Capital.  Coleman misrepresented in the email that only a small amount had been drawn from the Vesta Capital line, rather than approximately $28.5 million.  Coleman also failed to disclose that he had drawn the funds from the line of credit for his personal use.

42. In response, Client 2 asked Coleman for confirmation that he would never again use their account as collateral, which Coleman provided.

### D. Coleman Obligates his Client to a $25 Million Line of Credit by Forging Client Signatures on Loan Documents

43. On June 13, 2019, days after making the assurance to Client 2 that he would not use their account as collateral, Coleman represented to a new bank ("Bank B") that he was authorized to pledge Client 2's account as collateral for a new line of credit.

44. Coleman arranged for Bank B to extend a $25 million line of credit to Coleman, Vesta Capital, and a corporate entity owned by Client 2.

45. During the closing of the line of credit transaction, Bank B notified Coleman that Client 2 would be required to provide written consent to the extension of the facility.

46. In response, Coleman provided Bank B with an email address that Coleman claimed belonged to Client 2. In fact, Coleman controlled the email account, intercepted the request for consent, forged his client's electronic signature on the consent form, and returned it to Bank B.

47. On August 30, 2019, Bank B funded the $25 million line of credit. Coleman immediately withdrew $22 million from the facility, which he used to repay his outstanding loan to Bank A and to pay the business expenses of several of his private companies.

48. Coleman never disclosed to Client 2 that he had obligated them, through their corporate entity, as borrowers on the $25 million line of credit and that their corporate entity was jointly and severally liable with Coleman and Vesta Capital to repay the funds drawn from the line.

49. As ongoing conditions of the line of credit transaction, Bank B required the borrowers to maintain unencumbered assets amounting to $50 million while the facility was

outstanding, and periodically to provide bank statements documenting the continued existence of these assets.

50. To comply with these conditions, Coleman provided Bank B with statements reflecting the approximately $100 million balance within Client 2's brokerage account still maintained at Bank A's affiliate.

51. Approximately two weeks after the $25 million line of credit was extended, however, Client 2 transferred the funds held in the brokerage account to a new account over which Coleman had no visibility or control.

52. Absent these funds, Coleman was unable to comply with Bank B's requirement to provide evidence of unencumbered funds.

53. To prevent default, Coleman fabricated monthly account statements purporting to show that Client 2's original brokerage account at Bank A remained active and continued to hold approximately $100 million in unencumbered assets when, in fact, the account reflected a zero balance. Coleman emailed these false statements to Bank B on at least three occasions between November 25, 2019 and March 18, 2020.

**E.      Coleman Pledges his Clients' Feeder Fund Investment as Collateral Without Authorization**

54. In December 2019, Coleman presented Client 2 with the opportunity to invest in two private funds (the "Master Funds") through the Vesta Feeder Fund, which was established by Coleman and managed by Vesta Advisors.

55. Defendant served as investment adviser to the Feeder Fund. Vesta Advisors was the Feeder Fund's designated investment manager and wielded exclusive power to direct the business and affairs of the Fund, and Coleman controlled Vesta Advisors.

56. Client 2, in part through a family-owned entity, committed to invest a total of $20 million in the Vesta Feeder Fund in late January 2020 and funded that commitment in early February 2020. The $20 million investment was held in a Vesta Feeder Fund account maintained at Bank B while it awaited transfer to the Master Funds.

57. Around this time, Coleman requested from Bank B a three-month extension of the repayment date for the $25 million line of credit, which was due to be repaid in full at the end of February 2020. Bank B agreed, but demanded additional guaranties as well as the posting of collateral.

58. In March 2020, Coleman, acting through Vesta Advisors and the Vesta Feeder Fund's general partner, arranged for the Vesta Feeder Fund to guarantee repayment of the $25 million line of credit, and for the Fund to pledge Client 2's $20 million investment, which had not yet been transferred to the Master Funds, as collateral for the line of credit.

59. To finalize the extension, Bank B required written acknowledgement from Client 2 evidencing Client 2's consent to the guaranty and the pledge. At Coleman's request, Bank B again sent a consent form to the fraudulent email address controlled by Coleman, and again Coleman forged Client 2's electronic signature.

60. Shortly after Bank B granted the three-month extension, Coleman attempted to reverse the guaranty and pledge of assets provided by the Vesta Feeder Fund, informing Bank B that the Fund's general partner lacked the authority to bind the Vesta Feeder Fund as a guarantor or to pledge its assets.

61. On May 11, 2020, Bank B declared Coleman to be in default of the line of credit agreement and seized Client 2's $20 million investment in the Vesta Feeder Fund as partial repayment of the amount outstanding on the facility.

62. Shortly thereafter, Coleman admitted to Client 2 that he had used the funds they had committed to the Vesta Feeder Fund in connection with a personal debt obligation, contrary to Client 2's express instructions, and lost the money. He also committed to repaying Client 2 by June 30, 2020.

**III.   Coleman Targets Two Private Lenders for Additional Financing to Repay his Advisory Clients and Other Creditors**

   **A.   Coleman Makes False Representations to Obtain a $50 Million Loan to Repay his Clients**

63. By June 30, 2020, Coleman lacked sufficient funds to repay Client 2 and sought external financing from a variety of lenders, including a New York City-based firm that provides debt financing to private companies ("Private Lender 1").

64. On September 1, 2020, Private Lender 1, through an affiliated entity, extended a $50 million multi-draw term loan to certain private companies controlled by Coleman, including Vesta Advisors. As collateral for the loan, Coleman pledged securities in the form of stock and equity interests in several of his companies.

65. Coleman, acting through Vesta Advisors, provided a number of representations and warranties to Private Lender 1 in exchange for the loan, including that he would use the loan proceeds to finance a corporate acquisition. In reality, Coleman intended to use a large part of the loan proceeds to repay Client 2.

66. On September 2, 2020, Coleman withdrew over $20 million from the facility, the bulk of which Coleman transferred to Client 2 through a series of transactions.

67. Coleman did not disclose his misuse of Private Lender 1's loan proceeds for many months. Private Lender 1 expected that he was holding the funds until he identified a suitable corporate acquisition.

68. Defendant's misrepresentations and omissions were material to Private Lender 1's decision to accept the posted collateral and extend the loan.

69. In late July 2021, Coleman admitted to Private Lender 1 that he had misused the loan proceeds but falsely told Private Lender 1 that he had made emergency use of the funds to close on the Energy Venture in September 2020 after a co-investor backed out unexpectedly.

70. In support of this lie, Coleman provided Private Lender 1 with modified deal documents from the Energy Venture deal reflecting a September 2020 date, rather than the actual December 2018 date, as well as fabricated bank documents.

71. In light of Coleman's explanation and documentation, his promise to return a substantial portion of the misused proceeds, and other consideration such as additional security interests, Private Lender 1 agreed to forbear from exercising certain rights and remedies available to it in light of Coleman's companies' default.

**B.   Coleman and Companies Under his Control Make False Representations to Obtain a $50 Million Loan to Repay Private Lender 1**

72. Rather than disclose that he lacked sufficient funds to repay the loan, Coleman sent to Private Lender 1 a fabricated bank email and account statement purportedly showing his efforts to wire the funds while simultaneously seeking new financing.

73. On October 22, 2021, Coleman secured financing from another private lender ("Private Lender 2") in the form of a $50 million delayed-draw loan extended to a company under Coleman's control.

74. In exchange for the loan, Coleman provided Private Lender 2 with warrants to purchase membership interests in two of Coleman's companies and pledged as collateral certain securities he owned, including shares and membership interests in Coleman-controlled

companies. Warrants are financial instruments that give the right, but not the obligation, to buy or sell a security for a specific price before a particular date.

75. Coleman misrepresented to Private Lender 2 that he would use the loan proceeds to finance corporate acquisitions. In fact, as set forth below, Coleman used the funds largely to repay Private Lender 1 and other creditors as well as to pay personal expenses.

76. Coleman also misrepresented that the pledged collateral was free of liens when, in fact, certain collateral was encumbered by Private Lender 1. Coleman also provided Private Lender 2 with fabricated UCC-3 termination statements purportedly reflecting the release of liens on certain pledged collateral that, in reality, remained active.

77. Between October 2021 and March 2022, Private Lender 2 extended over $47.5 million to Coleman and his companies in reliance on Coleman's representations, including that he would use the loan proceeds to purchase a number of insurance brokerage companies.

78. Coleman's misrepresentations and omissions were material to Private Lender 2's decision to accept the posted collateral and to extend the loan.

79. Coleman failed to purchase at least four of the insurance brokers for which he had sought financing from Private Lender 2, diverting at least $31 million of the $47.5 million to pay creditors and other personal expenses.

80. To conceal his fraud, Coleman provided Private Lender 2 with falsified documents, including a bank statement modified to falsely reflect wire payments to the owners of certain insurance brokers Coleman claimed to have purchased.

C. **Coleman Defaults on the Loans Extended by Private Lender 1 and Private Lender 2**

81. Private Lender 1 and Private Lender 2 served Coleman with notices of default on June 27, 2022 and July 26, 2022, respectively.

82. Coleman's securities fraud-related misconduct caused Private Lender 1 and Private Lender 2 to suffer over $50 million in losses.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**

83. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 82, inclusive, as if they were fully set forth herein.

84. As a result of the conduct alleged herein, Defendant, in the offer or sale of securities, directly or indirectly, by the use of the means or instruments of transportation or communication in interstate commerce, or the mails:

    a. knowingly or recklessly employed devices, schemes, or artifices to defraud;

    b. knowingly, recklessly, or negligently obtained money or property by means of any untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c. knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

85. By engaging in the foregoing conduct, Defendant violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

86. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 82, inclusive, as if they were fully set forth herein.

87. As a result of the conduct alleged herein, Defendant knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentality of interstate commerce or of the mails, or a facility of a national securities exchange:

    a. employed devices, schemes or artifices to defraud;

    b. made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

88. By engaging in the foregoing conduct, Defendant violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### Violations of Sections 206(1) and 206(2) of the Advisers Act

89. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 82, inclusive, as if they were fully set forth herein.

90.     By engaging in the conduct alleged above, Defendant, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, while acting as an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)]: (a) employed a device, scheme, or artifice to defraud a client or prospective client; and (b) engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon a client or prospective client.

91.     With regard to the violations of Section 206(1) of the Advisers Act, Defendant engaged in the conduct intentionally or with severe recklessness. With regard to the violations of Section 206(2), Defendant engaged in the conduct at least negligently.

92.     By reason of the foregoing, Defendant has violated, and unless enjoined will continue to violate, Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1)-(2)].

**FOURTH CLAIM FOR RELIEF**
**Violation of Section 206(4) of the Advisers Act and Rule 206(4)-8 Promulgated Thereunder**

93.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 82, inclusive, as if they were fully set forth herein.

94.     At all times relevant to this Complaint, Coleman acted as an investment adviser to the Vesta Feeder Fund, which is a pooled investment vehicle as defined in Rule 206(4)-8(b) [17 C.F.R. § 275.206(4)-8(b)].

95.     Coleman, while acting as an investment adviser to a pooled investment vehicle, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to investors or prospective investors in the Vesta Feeder Fund.

96. By reason of the foregoing, Defendant violated, and unless enjoined, will continue to violate Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)], and Rule 206(4)-8 promulgated thereunder [17 C.F.R. § 275.206(4)-8].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendant Coleman from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 promulgated thereunder [17 C.F.R § 240.10b-5], and Sections 206(1), 206(2) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2) and (4)], and Rule 206(4)-8 promulgated thereunder [17 C.F.R. §§ 275.204-8];

### II.

Ordering Defendant Coleman to disgorge any and all ill-gotten gains, together with prejudgment interest, derived from the activities set forth in this Complaint; and

### III.

Ordering Defendant Coleman to pay civil penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e);

### IV.

Permanently prohibiting Coleman from serving as an officer or director of any company that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)],

pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)];

V.

Retaining jurisdiction of this action for purposes of enforcing any final judgment and orders; and

VI.

Granting such other and further relief as this Court may determine to be just and necessary.

Respectfully submitted,

s/ Karen M. Klotz
Karen M. Klotz (PA 88171)
Brendan McGlynn
Matthew Homberger
Attorneys for Plaintiff
Securities and Exchange Commission
1617 John F. Kennedy Boulevard, Suite 520
Philadelphia, PA 19103
Telephone: (215) 597-3100
Email: klotzk@sec.gov

Dated: February 6, 2023